> **EXHIBIT**
> **1**

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL2504454T-00

NEWPORT NEWS .................................................................... Circuit Court

2500 WASHINGTON AVENUE, NEWPORT NEWS 23607-4355
ADDRESS

TO:

DELTA AIR LINES, INC, CORPORATION SERVICE COMPANY

R/A CORPORATION SERVICE COMPAN

100 SHOCKOE SLIP FL 2

RICHMOND, VA -

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

JULY 30, 2025 ........................    REASON, ANGELA F _____ Clerk
DATE

by  /S/ SHAW, KIMBERLY _____
DEPUTY CLERK

Instructions:

Hearing Official: ..............................................................................

SERVED BY
DRISKELL SERVICES, INC.
757-961-6961

Uploaded: 2025JUL29 16:56 Filed By:Bar# 70470 TBOONE Reference: EF-177118
eFiled: 2025JUL29 NEWPORT NEWS CC KLSHAW at 2025JUL30 08:21 CL2504454T-00

## VIRGINIA:  IN THE CIRCUIT COURT FOR NEWPORT NEWS CITY

**TAYLOR BOONE,**

       Plaintiff

v.                                  **Case No.** _____

**DELTA AIR LINES, INC,**
**ENDEAVOR AIR, INC.,**
**WESTJET GROUP, INC.,**
**SKYWEST AIRLINES, INC.,**
**SKYWEST CHARTER, LLC,**
**UNIFI AVIATION, LLC &**
**PROSPECT AIRPORT SERVICES, LLC,**

       Defendants.

### COMPLAINT

Plaintiff, Taylor Boone (hereinafter "Taylor," "Boone," or "Mr. Boone," or all of these), by counsel or pro se, or both, moves for judgment against each of the Defendants captioned above, jointly and severally, on the grounds and in the amount set forth below.

Delta Air Lines, Inc, Endeavor Air, Inc., WestJet Group, Inc., Skywest Airlines, Inc., Skywest Charter, LLC, Unifi Aviation, LLC, and Prospect Airport Services, LLC, are herein "Delta".

### JURISDICTION

1.      This Court has subject matter jurisdiction.

### PARTIES

2.      Upon information and belief, each Defendant conducts business in Virginia and/or conducted business in Virginia at the time of the alleged incident.

3.    Delta is vicariously liable for the acts and omissions of its employees, subsidiaries, vendors, and contractors, whether under the Montreal Convention, Air Carrier Access Act, Virginia law, the Airline Deregulation Act, or all.

4.    Taylor Boone was and is a resident of Virginia.

## FACTS

5.    On or about August 19, 2024, Taylor was a passenger flying on Delta from Salt Lake City (SLC), Utah to Norfolk, Virginia (via Minneapolis, Minnesota), as part of, and as a continuation of, his single-ticketed Delta multi-city trip abroad—Norfolk, Virginia to Paris, France to Salt Lake City, Utah to Norfolk, Virginia.

6.    Before going down the breezeway, Taylor had explained in detail the transferring process to the two vendors along with Taylor's medical situation.

7.    Upon Taylor enplaning, neither the wheelchair vendors nor the Delta flight attendants (dressed in Delta uniforms with Delta insignia) could figure how to move the aircraft seat armrest—neither up or down—in order to be able to safely transfer Taylor from the thin aisle chair on wheels to the aircraft seat without having to lift him up.

8.    The vendors and the flight attendants were hurrying from the very beginning, probably in order to push back in time.

9.    Taylor tried to coordinate everyone and be the spokesperson, but it was chaotic and nobody was heeding him. He was trying to explain to them where to put his wheelchair wheels in the cabin, along with his wheelchair's armrests, and how to put the frame in the closet. But, rather than taking time and being methodical and calm, everyone was rushing.

10.    Taylor's original seat's armrest would not lift, so the flight attendant (FA) told the vendors to put Taylor in 6D. Taylor asked for a customer resolution officer (CRO), so the FA asked for a CRO and then came back.

11.    The aircraft size had changed to a very small aircraft (Ombray or Embraer) without Taylor knowing.

12.    The CRO arrived. She was dressed in a red pant suit. Taylor explained the events.

13.    Then the CRO left the airplane, but did not tell anyone where she was going.

14.    Everyone was wondering where she went; the FA didn't know, but thought maybe the CRO was switching Taylor's seats at the gate; nobody knew what the CRO was doing.

15.    The vendors had difficulty getting the aisle chair around the corner from first class.

16.    At this point, the FA told the venders to just put Taylor in first class in the first row—seat 1C.

17.    But neither the vendors nor the FA could get the seat 1C armrest to go down.

18.    Taylor was fearful he would be injured (patients buttocks debrided, plastic, lie on stomachs for months to allow tissue to heal, fatal). Emelea Rose Link, Delta Air Lines MSP Lead Complaint Resolution Official, later said for sure this is a lower quality of life.

19.    So Taylor asked to be put in row 2, but the armrest wouldn't go down there either.

20.    The vendor supervisor tried to put down the armrest, but said he couldn't put it down.

21.    Taylor explained to the vendors and FA that in a previous experience the same thing had happened—Taylor explained that the FAs couldn't drop the armrest upon enplaning,

and so they had lifted Taylor over the armrest, only for the vendors at the destination airport to put the armrest down when deplaning Taylor.

22.    Taylor asked the FA and vendors if this might be the situation here—whether the armrest really could be moved.

23.    The vendors said no.

24.    The FA said no.

25.    The FA and Vendors said the only option was to lift Taylor over the armrest.

26.    So, Taylor asked for blankets to put on the armrest to cushion it in case they touched his buttocks to the armrest, or, heaven forbid, dropped him, telling them that his buttocks cannot even rub the armrest because it could scrape him and his quality of life would be over.

27.    The FA said there were no blankets and no pillows. The FA and vendors said they could lift Taylor over the armrest.

28.    So, when the vendors went to begin the process of lifting Taylor, Taylor tried telling the vendors they can't let Taylor touch the armrest, they can't set him down on the armrest, and they have to do it in one motion. The vendors said okay they will do that.

29.    The supervising vendor (the one by Taylor's feet and who spoke English) was trying to tell the vendor behind Taylor how to lift Taylor up by his arms. Taylor realized they couldn't speak good English and they hadn't been trained in proper transfer of a paralyzed person.

30.    The rear vendor stepped up onto the seat behind Taylor's seat to get better position/power/angle/torque in order to lift Taylor. Without communicating with Taylor or with

each other, the vendors were hurriedly attempting to lift Taylor because the flight attendant was telling them to hurry.

31.    There was no coordination as a team effort between the vendors and the flight attendant.

32.    Taylor tried to coordinate, but they did not heed him.

33.    Before Taylor could get anything coordinated, the vendor behind Taylor reached under Taylor's arms and the supervising vendor grabbed Taylor's ankles, not even Taylor's knees, and lifted Taylor, and while lifting Taylor over the armrest, dropped Taylor on top of the armrest.

34.    The vendors were required to lift Taylor to get him in his seat, but instead of lifting Taylor, the vendors dragged him across the armrest.

35.    Taylor was trying to help and lift his weight, but Taylor couldn't.

36.    So the very thing that Taylor had feared since is accident happened to him—he had been dropped on an armrest, and also had been dragged across said armrest.

37.    The drop was blunt force trauma, right on Taylor's buttocks.

38.    The pain was inexplicable.

39.    Taylor asked for the CRO.

40.    While Taylor was waiting for CRO, the pilot came out and figured out how to drop the armrest on seat 1A.

41.    Taylor asked the pilot if he could do it on Taylor's seat.

42.    So the pilot dropped the armrest on Taylor's seat.

43.    This bewildered Taylor, the vendors and the FA.

44.    The pilot was very nice. He had red hair.

45.    The CRO arrived and Taylor told her that Taylor wanted to file a formal complaint.

46.    During said process of attempting to lift Taylor over the aircraft seat armrest from the aisle chair into the aircraft seat, the vendors were acting at the direction of the flight attendants and the pilot.

47.    During said process of the vendors attempting to lift Taylor over the armrest and into his sat, dropping Taylor on the hard solid seat armrest, forcefully impacting the armrest, and then dragging him across the armrest into his seat, they proximately caused Taylor injury, pain and suffering, including without limitation his buttocks area and leg(s).

48.    All the above occurred, despite Taylor weighing approximately 220 pounds.

49.    None of the individuals offered Taylor medical assistance.

50.    Taylor's buttocks were bruised and scraped. The pilot, flight attendants and vendors, through commission or omission, or both, caused Taylor injury and excruciating pain.

51.    Taylor's pain baseline was already bad, but since the accident causing him injury, he deals with more pain—location, type and degree—which pain is permanent.

52.    Neither the flight crew (pilot nor flight attendants) nor the vendors were adequately trained in transporting a paralyzed person like Taylor.

53.    Taylor is an eggshell plaintiff.

54.    A greater duty of care is owed to Taylor because each of defendants is a common carrier.

55.    Ms. Link later said Delta should have rebooked Taylor on a different airplane.

56.    Ms. Link works with federal laws to ensure everyone is compliant regarding disabled persons.

57.    Ms. Link indicated that the Delta CRO created a report to audit the wheelchair vendors, which report was provided to Ms. Link.

58.    A report is done in all cases for internal communications in order to avoid future mishaps, not just in anticipation of litigation.

59.    Ms. Link is a nurse.

60.    Ms. Link has a daughter with a disability.

61.    Ms. Link understands paralyzed issues, including neuropathic pain and pain going haywire.

62.    Ms. Link confirmed that the size of the aircraft on which Taylor made his reservation had changed to a smaller aircraft after Taylor had purchased his ticket, without Taylor knowing of the change.

63.    Ms. Link said, after 25 yrs in nursing, airplanes are not built for transferring paralyzed people.

64.    Ms. Link said airlines are decades behind in accessibility.

65.    Ms. Link said one of the biggest obstacles is seats are not compliant for transferring.

66.    Ms. Link suggested that next time, I call delta's disability desk to put me in the correct plane.

67.    Taylor told Ms. Link that he had called the Delta accessibility desk ahead of time.

68.    Had the FA and the vendors slowed down and taken a little time to figure out how to lower the armrest (which the pilot eventually did), Taylor would not have been injured.

69.    Delta was hurrying, trying to push the airplane back—pushback.

70.    The original airplane was changed because it had mechanical problems.

71.     Ms. Link encourages people to contact DOT because the more complaints there are, the more change there will be.

72.     Ms. Link said that none of the vendors are medically trained in transfers and that there is just no medical background of those people who are doing transfers.

73.     Ms. Link said advocates are trying to get transfer specialists and equipment.

74.     Ms. Link then said vendors are trained in transfer, but are not medical personnel.

75.     Ms. Link said vendors are trained with a specific prototype, but not with people like Taylor who is completely different from another customer with an aisle chair.

76.     Ms. Link said the vendor training is not fine tuned for differences, and that vendors are are trained in procedure, but not in nuances of each different customer.

77.     Ms. Link said that she thinks that customer care would compensate Taylor based on his facts, but can't guarantee it, but that Taylor has a very compelling situation.

78.     Ms. Link said that Delta always wants to do right by its customers with disabilities.

79.     Ms. Link indicated that the vendor dropping me over an unmovable armrest entailed failures along the way, including without limitation that Taylor never should have been on that aircraft.

80.     Ms. Link indicated that Delta should have rebooked Taylor on a different aircraft like a 737 or Airbus, with bigger aisles and bigger seats.

81.     Ms. Link did not know why the aircraft was switched out, but switch outs are typically due to maintenance issues. She said the "ship got pulled".

82.     Ms. Link said that vendors are trained in lifting paralyzed people, but only in the standard procedures, not in Taylor's nuanced situation, as Delta and vendors stick to the same

education they got, not to the specific situation of people such as Taylor. They train to the standard, but not to the nuances of other customers. They are educated in one standard procedure, but not nuances of each customer who are very different, like the customer like his leg contracture—leg shoots out.

83.    Ms. Link said that each customer has such a different type of body, injury, and underlying health.

84.    Ms. Link said vendors are trained to the standard, but they just don't have the nuances because they are not medical personnel.

85.    Vendors, as used by Ms. Link, includes the vendors who dropped Taylor.

86.    The word "vendor" or "vendors" herein refers to the vendors who dropped Taylor.

87.    Vendors are not medical personnel.

88.    Vendors are not physical therapists.

89.    Vendors are not occupational therapists.

90.    Vendors are the least educated, the least experienced, the least able to communicate in English (an absolutely indispensable skill needed), and the least trained of airline personnel.

91.    Vendors are put in charge of disabled passengers, whose healthcare providers have taught said disabled passengers much more regarding transfers of disabled passengers than uneducated and untrained vendors.

92.    Ms. Link said the hand grasp should be used.

93.    Ms. Link said the standard of care is to go up under the armpits and cross over the chest.

94.    Ms. Link said that the back vendor always should lead the lift.

95.    Ms. Link said that the back vendor should always count, which is the opposite of hurrying.

96.    Ms. Link said this is the process unless a passenger has a sling.

97.    Ms. Link said the vendor should be clasping on Taylor.

98.    Ms. Link said that regarding compensation, Taylor can tell customer service that Ms. Link thinks Taylor is a good candidate for compensation, and recommended Taylor call customer care for this purpose.

99.    Prospect is the wheelchair vendor whose personnel dropped Taylor.

100.    Delta 5511 connection is run by Unify.

101.    The Pilot and FAs were on a Delta connection, and are employees of Endeavor Airlines.

102.    Delta owns mainline Delta flights.

103.    Connections are commuter airlines, typically owned by Endeavor Airlines or West Jet.

104.    Delta owns Endeavor Airlines.

105.    Endeavor Airlines is a subsidiary of Delta.

106.    Delta owns the aircraft, and Endeavor staffs it.

107.    The FAs' uniforms do not say Endeavor. The FAs hold themselves out as Delta employees.

108.    As far as the public is concerned and as far as the public knows, when they get on a commuter flight like Taylor flew, the public would think that the pilots and the FAs are Delta employees unless there was an announcement that said otherwise.

109.    Delta knows or should know that when passengers get on a Delta flight, like Taylor's flight, the passengers think they are getting on a Delta airline because the passengers bought their ticket from Delta and they think the pilot and FAs are Delta

110.    It is safe to assume that the FAs and pilots on said Delta flights, like Taylor's flight, are acting on behalf of Delta.

111.    The Montreal Convention applies to international carriage between two countries that are parties to the treaty — both the U.S. and France are parties.

112.    Taylor's Delta ticket or itinerary from Virginia to France to Utah to Virginia is a single ticket, itinerary, operation or booking.

113.    The individuals not raising the armrest or causing Taylor to come in contact with the armrest, or both, was an unexpected or unusual event or happening that was external to him (hereinafter "event"). *Air France v. Saks*, 470 U.S. 392, 405, 105 S. Ct. 1338, 1345 (1985).

114.    The event was unexpected.

115.    The event was not expected by Taylor.

116.    The event was not expected by anybody else in the aircraft.

117.    A passenger in the same or similar situation would not expect the event.

118.    The event was unusual.

119.    The event was unusual for or to Taylor.

120.    The event was unusual for or to the other passengers in the airplane.

121.    The event would be unusual for or to a passenger in the same or similar situation.

122.    The event was external to Taylor.

123.    Taylor had no involvement in the event.

124.    Taylor was unaware of the conduct or knowledge of the individuals not raising the armrest or not knowing how to raise the armrest or not knowing it could be raised or negligently lifting Taylor or causing Taylor to come in contact with the armrest, or all, until said event or events occurred.

125.    Delta's or the flight attendant's or the vendor's, or all of their, conduct proximately caused Taylor to be injured and to experience great pain and suffering, which continued and continues.

## I.    MONTREAL CONVENTION

126.    **Bodily Injury.** Under Article 17(1) of the Montreal Convention, each of the Defendant(s), jointly and severally, by and through their owners, officers, agents, servants and employees, are strictly liable for the bodily injury of Taylor and his damages. The facts herein establish an Article 17 accident. *We CBD, LLC v. Planet Nine Priv. Air, LLC*, 109 F.4th 295, 2024 U.S. App. LEXIS 18500, 2024 WL 3543766 (4th Cir. 2024)

127.    Under Article 17 of the Montreal Convention, liability is imposed on an air carrier for a passenger's bodily injury caused by an accident that occurred in connection with an international flight. *Olympic Airways v. Husain*, 540 U.S. 644, 124 S. Ct. 1221, 1223-24, 157 L. Ed. 2d 1146 (U.S. 2004). *Sinnokrot v. Saudi Arabian Airlines Corp.*, 2020 U.S. Dist. LEXIS 142818, *6, 2020 WL 2738237 (EDVA Alexandria Div 2020)

128.    The term "accident" is an unexpected or unusual event or happening that is external to the passenger, which causes an injury, as was the case for Taylor. *Sinnokrot v. Saudi Arabian Airlines Corp.*, 2020 U.S. Dist. LEXIS 142818, *6, 2020 WL 2738237 (U.S. 2020); *Air France v. Saks*, 470 U.S. 392, 405, 105 S. Ct. 1338, 84 L. Ed. 2d 289 (U.S. 1985); *Hipolito v. Nw. Airlines, Inc.*, 15 Fed. App'x 109, 111 (4th Cir. 2001).

129.    "The *Saks* Court held that this 'definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injury.'" *Hipolito* at 111. (quoting *Saks*, 470 U.S. at 405).

130.    In addition, "'[a]ccident refers to the cause of injury rather than the injury itself.'" *Hipolito at 111* (quoting *Sakaria v. Trans World Airlines*, 8 F.3d 164, 170 (4th Cir. 1993), *cert. denied*, 511 U.S. 1083, 114 S. Ct. 1835, 128 L. Ed. 2d 463 (1994)). *Sinnokrot v. Saudi Arabian Airlines Corp.*, January 16, 2020 U.S. Dist. LEXIS 142818, *6-7, 2020 WL 2738237 (EDVA Alexandria Div 2020); *We CBD, LLC v. Planet Nine Priv. Air, LLC*, 109 F.4th 295, 305-307, 2024 U.S. App. LEXIS 18500, *18-21, 2024 WL 3543766; *Sakaria v. Trans World Airlines*, 8 F.3d 164, 170 (4th Cir. 1993) (ruling that applicable term "'accident' refers to the cause of injury rather than the injury itself"); *Air Fr. v. Saks*, 470 U.S. 392, 398, 105 S. Ct. 1338, 84 L. Ed. 2d 289 (1985) (explaining that "Article 17 [of the Warsaw Convention] refers to an accident *which caused* the passenger's injury, and not to an accident which *is* the passenger's injury"); *Prescod v. AMR, Inc.*, 383 F.3d 861, 869 (9th Cir. 2004) ("The [Warsaw] Convention does not state that the ultimate injury or death, as opposed to the relevant accident, must occur at any particular time following the accident."); *Narayanan v. Brit. Airways*, 747 F.3d 1125, 1128-29 (9th Cir. 2014) (ruling [**20] that Montreal Convention's statute of limitations governs wrongful death claim for failure to provide supplemental in-flight oxygen, even if claim does not accrue until six months after flight).

131.    Said event or happening proximately caused Taylor permanent personal injury and permanent pain and suffering.

132.    **Costs.** Apart from attorney's fees, pursuant to Article 22(6), Plaintiff demands Plaintiff's costs and expenses of this litigation incurred by Plaintiff, to be shown at trial or after trial.

133.    ". . . Article 22 provides that the Convention's limits on compensation for personal injury or delay of baggage and cargo 'shall not prevent the court from awarding, in accordance with its own law, in addition, the whole or part of the court costs and of the other expenses of the litigation incurred by the plaintiff, including interest." *Chattopadhyay v. Aeroflot Russian Airlines*, 2011 U.S. Dist. LEXIS 163673, *29, 2011 WL 13220279 (emphasis added)(Central District of California 2011); *Muoneke v. Compagnie Nationale Air Fr.*, 330 Fed. Appx. 457, 462, 2009 U.S. App. LEXIS 10244, *13 (5th Cir. 2009)

134.    **Attorney's Fees.** Additionally, under Article 22(6), Plaintiff demands plaintiff's attorney's fees of the litigation incurred by the plaintiff, including interest as authorized by law.

135.    ". . . [T]he Convention does not bar the recovery of attorneys' fees. Montreal Convention, Art. 23." *Chattopadhyay v. Aeroflot Russian Airlines*, 2011 U.S. Dist. LEXIS 163673, *29, 2011 WL 13220279 (U.S. 2011)

136.    Additionally, the Montreal Convention provides that the availability of attorney's fees is governed by local law. In Virginia, attorney's fees may be awarded by virtue of agreement of the parties or by a statute providing for attorney's fees.

137.    The Virginia Consumer Protection Act, a local law and statute, provides for attorney's fees.

138.    Section 59.1-207 provides that "nothing in this section shall prevent the court from ordering restitution and payment of reasonable attorney's fees and court costs pursuant to §59.1-204(B) to individuals aggrieved as a result of an unintentional violation of this chapter."

139. §59.1-204(B) provides, "Notwithstanding any other provision of law to the contrary, in addition to any damages awarded, such person also may be awarded reasonable attorneys' fees and court costs."

140. The Montreal Convention is not contrary to the VCPA, but rather actually is in line with the VCPA.

141. One does not look to whether Taylor can be awarded damages based on substantive liability under the VCPA, as the Montreal Convention preempts state law with regard to damages. However, with regard to attorney's fees, one can look to the VCPA to determine whether any provision of the VCPA was violated. In other words, while liability is determined by the Montreal Convention, attorney's fees are determined by the VCPA, as if the VCPA had not been preempted by the Montreal Convention with regard to liability and damages.

142. United represented to Taylor safe passage.

143. United's representing to Taylor safe passage was a misrepresentation, false pretense, false promise, misleading, and dishonest ("misrepresentation").

144. United's representing to Taylor safe passage was a misrepresentation and dishonest because United knew or should have known that the event not only could happen but probably would happen. United should have and could have implemented safeguards to prevent the event that injured Taylor.

145. Taylor inserts any and all of the other terms in the VCPA in the place of the term "misrepresentation," and adopts them herein.

146. United failed in this regard, whether intentionally or unintentionally, whether via strict liability (Montreal Convention), negligence, or otherwise. Either way, United simply did not ensure the safe passage of Taylor as it had promised.

147.    Therefore, United violated the VCPA, even if only in assessing attorney's fees, not in determining liability and damages.

## II.    COMMON LAW NEGLIGENCE

148.    Delta had a duty (heightened duty) to provide safe passage of Taylor, including without limitation the process, the transfer, the training, and the hiring, but breached this duty by failing in all of the foregoing as noted by the alleged facts herein, which breaches proximately caused Taylor permanent injury, pain and suffering.

## III.    COMMON LAW GROSS NEGLIGENCE

149.    Plaintiff incorporates all allegations herein as if set forth here.

IV.    Each of Defendant's conduct shocks fair-minded people. Each of Defendants took no measures whatsoever to prevent Taylor's injury. By their own admission, they caused Taylor's injuries. Each of Defendants admit that they failed in a number of their duties, as alleged herein.

WHEREFORE, Taylor Boone, by counsel, moves the Court for a judgment and award of execution against Defendants, jointly and severally, in the amount of TWENTY-TWO MILLION US DOLLARS ($22,000,000.00), and $350,000 punitive damages, and attorney's fees per the VCPA, and the costs of these proceedings, and for all pre-judgment and post-judgment interest allowed by law, and for such other and further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

                                 **TAYLOR BOONE**
                                 By Counsel or pro se, or both

By: _____

**Page 16 of 17**

Taylor Boone, Esq, MBA
VSB# 70470
Adams & Boone Attorneys at Law PLLC
1604 W. Little Neck Rd.
Virginia Beach 23452
Telephone: (757) 617-5509
Facsimile: (757) 257-8103
Email: AdamsBooneLaw@gmail.com
*Plaintiff's Counsel or pro se, or both*

**VIRGINIA:  IN THE CIRCUIT COURT FOR NEWPORT NEWS CITY**

**TAYLOR BOONE,**

     Plaintiff

v.                                                        **Case No. CL2504454T-00**

**DELTA AIR LINES, INC,**
**ENDEAVOR AIR, INC.,**
**WESTJET GROUP, INC.,**
**SKYWEST AIRLINES, INC.,**
**SKYWEST CHARTER, LLC,**
**UNIFI AVIATION, LLC &**
**PROSPECT AIRPORT SERVICES, LLC,**

     Defendants.

<u>**PLAINTIFF'S MOTION FOR LEAVE TO**</u>
<u>**FILE ATTACHED AMENDED COMPLAINT**</u>

     Plaintiff, Taylor Boone, by counsel, moves this Court for leave to file the attached

Amended Complaint, which is the correct version of the Complaint that should have initially been

filed.

     No prejudice will result to any Defendant upon the Court granting this Motion, as this

motion is being requested to be served on Defendant when the initial Complaint is served.

                               **TAYLOR BOONE**
                               By Counsel

            By: _____

Taylor Boone, Esq, MBA
VSB# 70470
Adams & Boone Attorneys at Law PLLC
1604 W. Little Neck Rd.
Virginia Beach 23452
Telephone: (757) 617-5509
Facsimile: (757) 257-8103
Email: AdamsBooneLaw@gmail.com
*Plaintiff's Counsel*

**VIRGINIA:  IN THE CIRCUIT COURT FOR NEWPORT NEWS CITY**

**TAYLOR BOONE,**

     Plaintiff

v.                                                                   **Case No. CL2504454T-00**

**DELTA AIR LINES, INC,**
**ENDEAVOR AIR, INC.,**
**WESTJET GROUP, INC.,**
**SKYWEST AIRLINES, INC.,**
**SKYWEST CHARTER, LLC,**
**UNIFI AVIATION, LLC &**
**PROSPECT AIRPORT SERVICES, LLC,**

     Defendants.

<u>**PLAINTIFF'S MOTION FOR LEAVE TO**</u>
<u>**FILE ATTACHED AMENDED COMPLAINT**</u>

Plaintiff, Taylor Boone, by counsel, moves this Court for leave to file the attached Amended Complaint, which is the correct version of the Complaint that should have initially been filed.

No prejudice will result to any Defendant upon the Court granting this Motion, as this motion is being requested to be served on Defendant when the initial Complaint is served.

                                   **TAYLOR BOONE**
                                   By Counsel

              By: _____

Taylor Boone, Esq, MBA
VSB# 70470
Adams & Boone Attorneys at Law PLLC
1604 W. Little Neck Rd.
Virginia Beach 23452
Telephone: (757) 617-5509
Facsimile: (757) 257-8103
Email: AdamsBooneLaw@gmail.com
*Plaintiff's Counsel*

**VIRGINIA: IN THE CIRCUIT COURT FOR NEWPORT NEWS CITY**

**TAYLOR BOONE,**

     Plaintiff

v.

**DELTA AIR LINES, INC,**
**ENDEAVOR AIR, INC.,**
**WESTJET GROUP, INC.,**
**SKYWEST AIRLINES, INC.,**
**SKYWEST CHARTER, LLC,**
**UNIFI AVIATION, LLC &**
**PROSPECT AIRPORT SERVICES, LLC,**

     Defendants.

**Case No. CL2504454T-00**

## AMENDED COMPLAINT

Plaintiff, Taylor Boone (hereinafter "Taylor," "Boone," or "Mr. Boone," or all of these), by counsel, moves for judgment against each of the Defendants captioned above, jointly and severally, on the grounds and in the amount set forth below.

Delta Air Lines, Inc, Endeavor Air, Inc., WestJet Group, Inc., Skywest Airlines, Inc., Skywest Charter, LLC, Unifi Aviation, LLC, and Prospect Airport Services, LLC, are herein "Delta" unless otherwise indicated or unless otherwise it would be objectively unreasonable.

## JURISDICTION

1.    This Court has subject matter jurisdiction.

## PARTIES

2.    Upon information and belief, each Defendant conducts business in Virginia and/or conducted business in Virginia at the time of the alleged incident.

3.      Delta is vicariously liable for the acts and omissions of its employees, subsidiaries, vendors, and contractors, whether under the Montreal Convention, Air Carrier Access Act, Virginia law, the Airline Deregulation Act, or all.

4.      Taylor Boone was and is a resident of Virginia.

## FACTS

5.      Unless otherwise indicated, all allegations herein relate to the incident in which Delta's vendors transferred Taylor, dropped Taylor, dragged Taylor, and injured Taylor, and on or about the same date.

6.      On or about August 19, 2024, Taylor was a passenger flying on Delta from Salt Lake City (SLC), Utah to Norfolk, Virginia (via Minneapolis, Minnesota), as part of, and as a continuation of, his single-ticketed Delta multi-city trip abroad—Norfolk, Virginia to Paris, France to Salt Lake City, Utah to Norfolk, Virginia.

7.      Taylor is paralyzed from his chest down and cannot walk. He is permanently relegated to a wheelchair. He suffers from dysesthetic pain syndrome. These conditions of Taylor existed prior to the incident that is the subject of the present lawsuit.

8.      Before going down the breezeway, Taylor had explained to the two assistance vendors in detail the transferring process along with Taylor's medical situation.

9.      Upon Taylor boarding the Delta aircraft, neither the wheelchair vendors nor the Delta flight attendants (dressed in Delta uniforms with Delta insignia) could determine or figure out how to move the aircraft seat armrest up or down out of the Taylor's way in order to be able to safely transfer Taylor from the thin aisle chair on wheels to the aircraft seat without having to lift him up over said armrest.

10.     The vendors and the flight attendants were hurrying from the very beginning, probably in order to push back in time.

11.     Taylor tried to coordinate everyone and be the spokesperson, but it was chaotic and nobody was heeding him. He was trying to explain to them where to put his wheelchair wheels in the cabin, along with his wheelchair's armrests, and how to put the frame in the closet. But, rather than taking time and being methodical and calm, everyone other than Taylor was rushing. Rushing the process created a substantially increased risk of injury to Taylor given the exacting process required for his safe transfer to the aircraft seat.

12.     Taylor's original seat's armrest would not lift, so the flight attendant (FA) told the vendors to put Taylor in 6D.

13.     Taylor asked for a customer resolution officer (CRO), so the FA asked for a CRO and then came back.

14.     The aircraft size had changed to a very small aircraft (Ombray or Embraer) without Taylor knowing.

15.     The CRO arrived. She was dressed in a red pant suit. Taylor explained the events.

16.     Then the CRO left the airplane, but did not tell anyone where she was going.

17.     Taylor perceived that the FA and vendors were wondering where the CRO had gone; the FA said she didn't know, but said she thought maybe the CRO was switching Taylor's seats at the gate; the FA and vendors indicated that they did not know what the CRO was doing.

18.     The vendors had difficulty getting the aisle chair around the corner from first class to get to Taylor's seat because of the airplane's smaller size and configuration.

19.     At this point, the FA told the venders to just put Taylor in first class in the first row—seat 1C.

20.     But neither the vendors nor the FA could get the seat 1C armrest to go down.

21.     Because of the foregoing, Taylor was fearful he would be injured (patients buttocks debrided, plastic, lie on stomachs for months to allow tissue to heal, perpetual pain, or fatal). Emelea Rose Link, Delta Air Lines MSP Lead Complaint Resolution Official, later said that for sure this is a lower quality of life.

22.     So, Taylor asked to be put in row 2, but neither the vendors nor the FA could get the row 2 seat armrest to go down.

23.     The vendor supervisor (one vendor was the supervisor and the other vendor his subordinate) tried to put down the armrest, but said he couldn't put it down.

24.     Taylor explained to the vendors and FA that in a previous experience involving Taylor the same thing had happened—Taylor explained that in said previous experience, the FAs couldn't move the armrest down upon Taylor boarding, and so they had lifted Taylor over the armrest, only for the vendors at the destination airport to move the armrest down when deplaning Taylor with a simple and quick moving of a latch or button.

25.     Taylor asked the FA and vendors if the foregoing might be the same issue in the situation that is the subject matter of the present lawsuit—whether the armrest really could be lowered.

26.     The vendors said no, the armrest could not be moved.

27.     The FA said no, the armrest could not be moved.

28.     The FA and Vendors said the only option was to lift Taylor over the armrest.

29.     So, Taylor asked for blankets to put on the armrest to cushion it in case the vendors touched Taylor's buttocks to the armrest, or, heaven forbid, dropped him, telling them

that his buttocks cannot even touch or rub the armrest because it could injure or scrape him, and his quality of life would be over.

30.     The FA said there were no blankets and no pillows.

31.     The FA and vendors said that Taylor could be lifted over the armrest by the vendors, the FA, or all.

32.     So, when the vendors went to begin the process of lifting Taylor, Taylor tried telling the vendors they can't let Taylor touch the armrest, they can't set him down on the armrest, and they have to do it in one motion. The vendors said okay and that they would do the foregoing.

33.     The supervising vendor (the one by Taylor's feet and who spoke English) was trying to tell the vendor behind Taylor how to lift Taylor up by his arms. Taylor realized they couldn't communicate well in English, as the rear vendor could barely communicate in English, there was confusion between the two vendors, and they to Taylor that the vendors hadn't been properly trained in the appropriate transfer of a paralyzed person.

34.     The rear vendor then abruptly and spontaneously stepped up onto the seat behind Taylor's seat—so that he was standing on the seat behind Taylor—apparently to get a better position/power/angle/torque in order to lift Taylor.

35.     Without communicating with Taylor or with each other, the vendors were hurriedly attempting to lift Taylor because, at least in part, the flight attendant was telling them to hurry.

36.     There was no coordination or a team effort between the vendors and the flight attendant. The same was true as between the two vendors.

37.     Taylor tried to coordinate, but they did not heed him.

38.     Before Taylor could get anything coordinated with the vendors or educate or guide the vendors, the vendor behind Taylor abruptly reached under Taylor's arms and the supervising vendor abruptly grabbed Taylor's ankles (not even Taylor's knees), and they quickly lifted Taylor, and then, while lifting Taylor over the armrest, dropped Taylor on top of the armrest.

39.     After dropping Taylor, the vendors should have lifted Taylor to get him in his seat since he was on the armrest, but instead of lifting Taylor, the vendors dragged him across the armrest towards Taylor's seat.

40.     Taylor was trying to help and lift his weight, but Taylor couldn't.

41.     Given the foregoing, the very thing that Taylor had feared would happen to him since becoming paralyzed, did happen to him—he was dropped on an armrest, and also he was dragged across said armrest.

42.     The drop was blunt force trauma, right on Taylor's buttocks.

43.     The pain was inexplicable.

44.     Taylor was maneuvered into his seat and his seat cushion was placed under his buttocks.

45.     Taylor asked for the CRO.

46.     While Taylor was waiting for the CRO, the pilot came out and figured out how to drop the armrest on seat 1A.

47.     Taylor asked the pilot if he could drop the armrest on Taylor's seat.

48.     So the pilot dropped the armrest on Taylor's seat.

49.     This bewildered Taylor, the vendors and the FA.

50.     Taylor's armrest was raised back up since Taylor was already sitting in his seat.

51.     The CRO arrived and Taylor told the CRO that Taylor wanted to file a formal complaint.

52.     During said process of attempting to lift Taylor over the aircraft seat armrest from the aisle chair into the aircraft seat, the vendors were acting at the direction of the flight attendants or the pilot, or both.

53.     During said process, and as a direct and proximate result of said process, of the vendors attempting to lift Taylor over the armrest and into his seat, dropping Taylor on the hard solid seat armrest, forcefully impacting the armrest, and then dragging him across the armrest into his seat, the vendors proximately caused Taylor injury, pain and suffering, including without limitation his buttocks area and leg(s), regular pain and other neuropathic pain that he had never experienced before.

54.     Taylor weighed approximately 220 pounds.

55.     None of the individuals offered Taylor medical assistance.

56.     Taylor's buttocks were bruised and scraped from the incident.  The pilot, flight attendants and vendors, through commission or omission, or both, proximately caused Taylor injury and excruciating pain.

57.     Taylor's pain baseline was already bad, but ever since the accident causing him injury, he deals with more pain—location, type and degree—which pain is permanent.

58.     Neither the flight crew (pilot nor flight attendants) nor the vendors were adequately trained in transporting a paralyzed person such as Taylor.

59.     Taylor had communicated his medical condition and transferring details to Delta's accessibility desk or department well before Taylor's trip and Delta had assured Taylor before his trip that Delta would ensure his safe passage.

60.     Taylor is an eggshell plaintiff, as before the incident, Taylor was paralyzed, suffered from dysesthetic pain syndrome, and suffered from other comorbidities.

61.     Each of defendants owed Taylor a greater duty of care because each of defendants is a common carrier.

62.     Ms. Link later said Delta should have rebooked Taylor on a different airplane when Delta realized the obstacles to safely transferring Taylor.

63.     Ms. Link works with federal laws to ensure everyone is compliant regarding disabled persons such as paralyzed Taylor.

64.     Ms. Link indicated that the Delta CRO created a report to audit the wheelchair vendors, which report was provided to Ms. Link.

65.     A report is done in all cases for internal communications in order to avoid future mishaps, not just in anticipation of litigation.

66.     Delta or its subsidiaries or its affiliates, or all, created or possesses, or both, a report or information, or both, related to the incident that is the subject matter of the present lawsuit, but which report or information Delta did not create in anticipation of litigation.

67.     Ms. Link is a nurse.

68.     Ms. Link has a daughter with a disability.

69.     Ms. Link understands paralyzed issues, including neuropathic pain and said pain going haywire.

70.     Ms. Link confirmed that the size of the aircraft on which Taylor made his reservation had changed to a smaller aircraft after Taylor had purchased his ticket, without Taylor knowing of the change.

71.     Ms. Link said that in her 25 years in nursing, airplanes are not built for transferring paralyzed people.

72.     Ms. Link said airlines are decades behind in accessibility.

73.     Ms. Link said one of the biggest obstacles is seats are not compliant for transferring passengers like Taylor.

74.     Ms. Link suggested that next time, Taylor call Delta's disability desk to put Taylor in the correct airplane.

75.     Taylor told Ms. Link that he <u>had</u> called the Delta accessibility desk before beginning to travel.

76.     Had the FA and the vendors slowed down, coordinated, and taken time to figure out how to lower the armrest (which the pilot eventually did), Taylor would not have been injured.

77.     Had Delta properly trained its workers and vendors or had its workers or vendors, or both, properly trained, Taylor would not have been injured.

78.     Delta was hurrying, trying to push the airplane back. Ms. Link indicated this is called "pushback."

79.     The original airplane was changed because it had mechanical problems.

80.     Ms. Link encourages people to contact DOT because the more complaints there are, the more change there will be.

81.     Ms. Link said that none of the vendors that Delta uses are medically trained in transfers and that there is just no medical background of those people who are doing transfers.

82.     Ms. Link said advocates are trying to get transfer specialists and equipment.

83.     Ms. Link then said vendors are trained in transfer, but vendors are not medical personnel.

84.     Ms. Link said vendors are trained with a specific prototype, not with people like Taylor, who is completely different than any other customer who requires an aisle chair.

85.     Ms. Link said the vendor transfer training is not fine-tuned for differences among disabled passengers, and that although vendors are trained in procedure, they are not trained in nuances of each different type of disabled customer.

86.     Ms. Link said that she thinks that customer care would compensate Taylor based on his facts, but can't guarantee it.

87.     Ms. Link said that Taylor has a very compelling situation for compensation.

88.     Ms. Link said that Delta always wants to do right by its customers with disabilities.

89.     Ms. Link indicated that the vendors dropping Taylor over an unmovable armrest, which ended up being moveable, entailed failures along the way, including without limitation that Taylor never should have been on that aircraft.

90.     Ms. Link indicated that Delta should have rebooked Taylor on a different aircraft like a 737 or Airbus, with bigger aisles and bigger seats.

91.     Ms. Link did not know why the aircraft was switched out, but switch outs are typically due to maintenance issues. She said the "ship got pulled".

92.     Ms. Link said that vendors are trained in lifting paralyzed people, but only in the standard procedures, not for Taylor's nuanced medical situation, as Delta and vendors stick to the same education they received, not to the specific situation of people such as Taylor.

93.     Vendors train to the standard regarding transfers, but not to the nuances of other customers (passengers).

94.     Vendors are educated in one standard procedure, but not the nuances of each customer, who is very different, such as a customer whose leg has contracture.

95.     Ms. Link said that each customer has a different type of body, injury, and underlying health.

96.     Ms. Link said vendors are trained to the standard, but they just don't have the training for nuances of every type of disabled passenger because the vendors are not medical personnel.

97.     The word "vendor(s)" as used by Ms. Link includes the vendors who dropped Taylor.

98.     The word "vendor" or "vendors" herein refers to and includes the vendors who dropped Taylor, unless otherwise clearly indicated.

99.     Vendors are not medical personnel.

100.    Vendors are not physical therapists.

101.    Vendors are not occupational therapists.

102.    Vendors are the least educated of airline workers.

103.    Vendors are the least experienced of airline workers.

104.    Vendors are the least able to communicate in English of airline workers (an absolutely indispensable required skill in transferring paralyzed passengers).

105.    Vendors are the least trained of airline workers.

106.    Vendors are put in charge of paralyzed passengers, whose healthcare providers have taught said paralyzed passengers much more regarding the process and technique of transferring paralyzed passengers than uneducated and untrained vendors are taught.

107.    Ms. Link said the hand grasp should have been used to transfer Taylor.

108.    Ms. Link said the standard of care for transferring paralyzed passengers such as Taylor is to go up under the armpits and cross over the chest.

109.    Ms. Link said that the rear vendor always should lead the lift.

110.    Ms. Link said that the rear vendor should always count, which is the opposite of hurrying.

111.    Ms. Link said the foregoing is the process unless a passenger has a sling.

112.    A sling was not used to transfer Taylor.

113.    Ms. Link said the vendor should been clasping his hands/wrists on Taylor.

114.    The vendors in Taylor's case did not do what Ms. Link said vendors should have done.

115.    Ms. Link said that regarding compensation, Taylor could tell Delta customer service that Ms. Link thinks that Taylor is a good candidate for compensation, and Ms. Link recommended that Taylor call Delta customer care for this purpose.

116.    Ms. Link indicated that Prospect is the wheelchair vendor whose personnel dropped Taylor.

117.    The word "Prospect" as used by Ms. Link means Prospect Airport Services, LLC.

118.    Prospect Airport Services, LLC employed the vendors who transferred Taylor.

119.    Delta has an affiliation with Prospect Airport Services, LLC for the training of vendors or the transport of paralyzed passengers such as Taylor, or both.

120. Ms. Link indicated that the Delta Flight 5511 connection involving Taylor was run by Unifi.

121. The word "Unifi" as used by Ms. Link means Unifi Aviation, LLC.

122. Unifi Aviation, LLC was involved in the facts that are the subject matter of the present lawsuit, whether via owning the aircraft, operating the aircraft or flight, running the flight, providing or employing (or both) the crew or FAs, or both, or otherwise.

123. Delta has an affiliation with Unifi Aviation, LLC, or is responsible for ensuring its conduct adheres to Delta's preferences, desires or requirements.

124. The Pilot and FAs of the flight involving Taylor were on a Delta connection, and are employees of Endeavor Airlines.

125. The word "Endeavor Airlines" as used by Ms. Link means Endeavor Air, Inc.

126. Endeavor Air, Inc was involved in the facts that are the subject matter of the present lawsuit, including without limitation that Endeavor Air, Inc provided or employed, or both, the pilots or FAs, or both, on the flight on which the vendors injured Taylor.

127. Delta owned mainline Delta flights.

128. Delta or its subsidiaries, or both, employed the pilots on the flight on which the vendors injured Taylor.

129. Delta or its subsidiaries, or both, employed the FAs on the flight on which the vendors injured Taylor.

130. Delta or its subsidiaries, or both, owned or contracted for the aircraft on the flight on which the vendors injured Taylor.

131. Delta or its subsidiaries, or both, operated or contracted for the operation of the aircraft on the flight on which the vendors injured Taylor.

132.    Delta connections are commuter airlines, typically owned by Endeavor Airlines (Endeavor Air, Inc) or WestJet.

133.    The word "WestJet" as used by Ms. Link means WestJet Group, Inc.

134.    WestJet or WestJet Group, Inc, or both, was involved in the facts that are the subject matter of the present lawsuit, including without limitation that WestJet Group, Inc operated Taylor's flight or employed, or both, the pilots or FAs, or both, on the flight on which the vendors injured Taylor.

135.    Delta owns Endeavor Air, Inc.

136.    Endeavor Air, Inc is a subsidiary of Delta.

137.    Delta owns Skywest Airlines, Inc or Skywest Charter, LLC, or both.

138.    Skywest Airlines, Inc or Skywest Charter, LLC, or both, is a subsidiary of Delta.

139.    Delta has an affiliation with Skywest Airlines, Inc or Skywest Charter, LLC, or both.

140.    Delta contracts with Skywest Airlines, Inc or Skywest Charter, LLC, or both, for the aircraft or operation of the aircraft, or both, related to Taylor's injury.

141.    Delta owns the aircraft in which Taylor was injured.

142.    Delta operated the aircraft in which Taylor was injured.

143.    Delta had an affiliation with the aircraft in which Taylor was injured.

144.    Delta contracted for the aircraft or operation of the aircraft, or both, related to Taylor's injury.

145.    Delta possesses records and information indicating on which flight or aircraft, or both, Taylor was injured.

146.    Delta has sufficient insurance to set aside reserves for Taylor's *ad damnum*.

147.    Endeavor Air, Inc staffs the aircraft in which Taylor was injured.

148.    Delta staffs the aircraft in which Taylor was injured.

149.    Delta contracted for the staff of the aircraft related to Taylor's injuries.

150.    Delta controlled the pilots regarding the flight in which Taylor was injured.

151.    Delta controlled the FAs regarding the flight in which Taylor was injured.

152.    The FAs on the flight in which Taylor was injured must adhere to Delta's standards, procedures, protocols, directives, guidance, or all, related to the FAs during Taylor's flight.

153.    The FAs failed to adhere to the things in the previous paragraph.

154.    The pilots on the flight in which Taylor was injured must adhere to Delta's standards, procedures, protocols, directives, guidance, or all, related to the pilots during Taylor's flight.

155.    The pilots failed to adhere to the things in the previous paragraph.

156.    The vendors on the flight in which Taylor was injured must adhere to standards, procedures, protocols, directives, guidance, or all, related to the vendors during Taylor's flight.

157.    The vendors failed to adhere to the things in the previous paragraph.

158.    Under the Air Carrier Access Act (ACAA), Delta is liable for the said vendors' training regarding transferring paralyzed passengers such as Taylor, said vendors' conduct or said vendors' omissions, or all.

159.    Delta is liable for the said vendors' conduct or omissions, or both, whether under the ACAA or otherwise.

160.    Delta is liable for the said vendors' conduct or omissions, or both, whether under the Montreal Convention or otherwise.

161. Delta is liable under the Montreal Convention for accidents that injure a passenger during boarding.

162. Delta was required to provide Taylor assistance with boarding, deplaning and making connections, including within the cabin.

163. Training was required for Delta and vendor (contractor) personnel who dealt with Taylor.

164. Delta was responsible for ensuring that said training required for Delta and vendor personnel was performed.

165. Delta was required to obtain an assurance of compliance from the vendors (contractors) who provided services to Taylor.

166. Delta failed to obtain said assurance of compliance.

167. The vendors failed to comply with said required training or training requirements, or both.

168. The FAs' uniforms did not say Endeavor on them.

169. The FAs held themselves out as Delta employees.

170. The FAs never represented or communicated, or both, to Taylor that the FAs were not Delta employees.

171. The FAs never represented or communicated, or both, to Taylor that the FAs were not Delta agents acting at the behest of Delta.

172. As far as the public is concerned and as far as the public knows, when the public gets on a commuter flight like Taylor flew, the public would think that the pilots and the FAs are Delta employees unless there was an announcement that said otherwise.

173.    Delta knows or should have known that when passengers get on a Delta flight, like Taylor's flight, the passengers think they are getting on a Delta airline because the passengers bought their ticket from Delta and they think the pilot and FAs are Delta employees.

174.    It is safe to assume that the FAs and pilots on said Delta flights, such as Taylor's flight, were acting on behalf of Delta.

175.    The Montreal Convention applies to international carriage between two countries that are parties to the treaty — both the U.S. and France are parties.

176.    Taylor's Delta ticket or itinerary from Virginia to France to Utah to Virginia is a single ticket, itinerary, operation or booking.

177.    The individuals not raising the armrest or causing Taylor to come in contact with the armrest or dragging Taylor across the armrest, or all, as alleged herein, was an unexpected or unusual event or happening that was external to Taylor (hereinafter "event"). *Air France v. Saks*, 470 U.S. 392, 405, 105 S. Ct. 1338, 1345 (1985).

178.    The words "incident" and "event" and "accident" are interchangeable herein.

179.    The event was unexpected.

180.    The event was not expected by Taylor.

181.    The event was not expected by anybody else in the aircraft.

182.    A passenger in the same or similar situation would not expect the event.

183.    The event was unusual.

184.    The event was unusual for or to Taylor.

185.    The event was unusual for or to the other passengers in the airplane.

186.    The event would be unusual for or to a passenger in the same or similar situation.

187.    The event was external to Taylor.

188.    Taylor had no involvement in the event.

189.    Taylor had no control over the event.

190.    Taylor was unaware of the conduct or knowledge of the individuals not raising the armrest or not knowing how to raise the armrest or not knowing it could be raised or negligently lifting Taylor or causing Taylor to come in contact with the armrest, or dragging Taylor across the armrest, or all, until said event or events occurred.

191.    Delta's or the flight attendant's or the vendor's, or all of their, conduct proximately caused Taylor to be injured and to experience great pain and suffering, which continued and continues.

## I.    <u>MONTREAL CONVENTION</u>

192.    Plaintiff incorporates all allegations herein as if set forth here.

193.    **<u>Bodily Injury.</u>** Under Article 17(1) of the Montreal Convention, each of the Defendant(s), jointly and severally, by and through their owners, officers, agents, servants and employees, are strictly liable for the bodily injury of Taylor and his damages. The facts herein establish an Article 17 accident. *We CBD, LLC v. Planet Nine Priv. Air, LLC*, 109 F.4th 295, 2024 U.S. App. LEXIS 18500, 2024 WL 3543766 (4th Cir. 2024)

194.    Under Article 17 of the Montreal Convention, liability is imposed on an air carrier for a passenger's bodily injury caused by an accident that occurred in connection with an international flight. *Olympic Airways v. Husain*, 540 U.S. 644, 124 S. Ct. 1221, 1223-24, 157 L. Ed. 2d 1146 (U.S. 2004). *Sinnokrot v. Saudi Arabian Airlines Corp.*, 2020 U.S. Dist. LEXIS 142818, *6, 2020 WL 2738237 (EDVA Alexandria Div 2020)

195.    The term "accident" is an unexpected or unusual event or happening that is external to the passenger, which causes an injury, as was the case for Taylor. *Sinnokrot v. Saudi*

*Arabian Airlines Corp.*, 2020 U.S. Dist. LEXIS 142818, *6, 2020 WL 2738237 (U.S. 2020); *Air France v. Saks*, 470 U.S. 392, 405, 105 S. Ct. 1338, 84 L. Ed. 2d 289 (U.S. 1985); *Hipolito v. Nw. Airlines, Inc.*, 15 Fed. App'x 109, 111 (4th Cir. 2001).

196.   "The *Saks* Court held that this 'definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injury.'" *Hipolito* at 111. (quoting *Saks*, 470 U.S. at 405).

197.   In addition, "'[a]ccident refers to the cause of injury rather than the injury itself.'" *Hipolito at 111* (quoting *Sakaria v. Trans World Airlines*, 8 F.3d 164, 170 (4th Cir. 1993), *cert. denied*, 511 U.S. 1083, 114 S. Ct. 1835, 128 L. Ed. 2d 463 (1994)). *Sinnokrot v. Saudi Arabian Airlines Corp.*, January 16, 2020 U.S. Dist. LEXIS 142818, *6-7, 2020 WL 2738237 (EDVA Alexandria Div 2020); *We CBD, LLC v. Planet Nine Priv. Air, LLC*, 109 F.4th 295, 305-307, 2024 U.S. App. LEXIS 18500, *18-21, 2024 WL 3543766; *Sakaria v. Trans World Airlines*, 8 F.3d 164, 170 (4th Cir. 1993) (ruling that applicable term "'accident' refers to the cause of injury rather than the injury itself"); *Air Fr. v. Saks*, 470 U.S. 392, 398, 105 S. Ct. 1338, 84 L. Ed. 2d 289 (1985) (explaining that "Article 17 [of the Warsaw Convention] refers to an accident *which caused* the passenger's injury, and not to an accident which *is* the passenger's injury"); *Prescod v. AMR, Inc.*, 383 F.3d 861, 869 (9th Cir. 2004) ("The [Warsaw] Convention does not state that the ultimate injury or death, as opposed to the relevant accident, must occur at any particular time following the accident."); *Narayanan v. Brit. Airways*, 747 F.3d 1125, 1128-29 (9th Cir. 2014) (ruling [**20] that Montreal Convention's statute of limitations governs wrongful death claim for failure to provide supplemental in-flight oxygen, even if claim does not accrue until six months after flight).

198.    The improper transfer procedure, the improper transfer itself, the vendors dropping Taylor on the hard solid armrest, the vendors dragging Taylor across the armrest, and each and every allegation of wrongdoing herein by each and every defendant herein was an accident that proximately caused Taylor permanent injury, pain and suffering, for which each and every defendant is strictly liable.

199.    Said accident, event or happening proximately caused Taylor permanent personal injury and permanent pain and suffering.

200.    Taylor did not contribute to the vendors dropping Taylor on said armrest or dragging Taylor across said armrest, or both.

201.    Taylor did not contribute to any wrong commission or wrong omission of any defendant.

202.    Because of the preceding paragraphs regard no contribution by Taylor, each and every defendant is liable for unlimited damages under the Montreal Convention.

203.    **Costs.** Apart from attorney's fees, pursuant to Article 22(6), Plaintiff demands Plaintiff's costs and expenses of this litigation incurred by Plaintiff, to be shown at trial or after trial.

204.    ". . . Article 22 provides that the Convention's limits on compensation for personal injury or delay of baggage and cargo 'shall not prevent the court from awarding, in accordance with its own law, in addition, the whole or part of the court costs and of the other expenses of the litigation incurred by the plaintiff, including interest." *Chattopadhyay v. Aeroflot Russian Airlines*, 2011 U.S. Dist. LEXIS 163673, *29, 2011 WL 13220279 (emphasis added)(Central District of California 2011); *Muoneke v. Compagnie Nationale Air Fr.*, 330 Fed. Appx. 457, 462, 2009 U.S. App. LEXIS 10244, *13 (5th Cir. 2009)

205.    **Attorney's Fees.** Additionally, under Article 22(6), Plaintiff demands plaintiff's attorney's fees of the litigation incurred by the plaintiff, including interest as authorized by law.

206.    ". . . [T]he Convention does <u>not</u> bar the recovery of attorneys' fees. Montreal Convention, Art. 23." *Chattopadhyay v. Aeroflot Russian Airlines*, 2011 U.S. Dist. LEXIS 163673, *29, 2011 WL 13220279 (U.S. 2011)

207.    Additionally, the Montreal Convention provides that the availability of attorney's fees is governed by local law. In Virginia, attorney's fees may be awarded by virtue of agreement of the parties or by a statute providing for attorney's fees.

208.    The Virginia Consumer Protection Act, a local law and statute, provides for attorney's fees.

209.    Section 59.1-207 provides that "nothing in this section shall prevent the court from ordering restitution and payment of reasonable attorney's fees and court costs pursuant to §59.1-204(B) to individuals aggrieved as a result of an unintentional violation of this chapter."

210.    §59.1-204(B) provides, "Notwithstanding any other provision of law to the contrary, in addition to any <u>damages</u> awarded, such person also may be awarded reasonable attorneys' fees and court costs."

211.    The Montreal Convention is not contrary to the VCPA, but rather actually is in line with the VCPA.

212.    One does not look to whether Taylor can be awarded damages based on substantive liability under the VCPA, as the Montreal Convention preempts state law with regard to damages. However, with regard to attorney's fees, one can look to the VCPA to determine whether any provision of the VCPA was violated. In other words, while liability is determined

by the Montreal Convention, attorney's fees are determined by the VCPA, as if the VCPA had not been preempted by the Montreal Convention with regard to liability and damages.

213. Delta represented to Taylor safe passage.

214. Delta's representing to Taylor safe passage was a misrepresentation, false pretense, false promise, misleading, and dishonest ("misrepresentation").

215. Delta's representing to Taylor safe passage was a misrepresentation and dishonest because Delta knew or should have known that the event not only could happen but probably would happen. Delta should have and could have implemented safeguards to prevent the event that injured Taylor.

216. Taylor inserts any and all of the other terms in the VCPA in the place of the term "misrepresentation," and adopts them herein.

217. Delta failed in this regard, whether intentionally or unintentionally, whether via strict liability (Montreal Convention), negligence, or otherwise. Either way, Delta simply did not ensure the safe passage of Taylor as it had promised.

218. Therefore, Delta violated the VCPA, even if only in assessing attorney's fees, not in determining liability and damages.

## II.    COMMON LAW NEGLIGENCE

219. Plaintiff incorporates all allegations herein as if set forth here.

220. Delta had a duty (heightened duty) to provide safe passage of Taylor, including without limitation the process, the transfer, the training, and the hiring, but breached this duty by failing in all of the foregoing as noted by the alleged facts herein, which breaches proximately caused Taylor permanent injury, pain and suffering.

## III.    COMMON LAW GROSS NEGLIGENCE

221.    Plaintiff incorporates all allegations herein as if set forth here.

222.    Each of Defendant's conduct shocks fair-minded people. Each of Defendants took no measures whatsoever to prevent Taylor's injury. By their own admission, each Defendant caused Taylor's injuries. Each of Defendants admit that it failed in a number of its duties, as alleged herein.

WHEREFORE, Taylor Boone, by counsel, moves the Court for a judgment and award of execution against Defendants, jointly and severally, in the amount of TWENTY-TWO MILLION US DOLLARS ($22,000,000.00), and $350,000 punitive damages, and attorney's fees per the VCPA, and the costs of these proceedings, and for all pre-judgment and post-judgment interest allowed by law, and for such other and further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

**TAYLOR BOONE**
By Counsel or pro se, or both

By: _____

Taylor Boone, Esq, MBA
VSB# 70470
Adams & Boone Attorneys at Law PLLC
1604 W. Little Neck Rd.
Virginia Beach 23452
Telephone: (757) 617-5509
Facsimile: (757) 257-8103
Email: AdamsBooneLaw@gmail.com
*Plaintiff's Counsel or pro se, or both*